# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | |
|---|---|
| **JASON REBARDI** | **CIVIL ACTION NO. 06-2255** |
| **VS.** | **SECTION P** |
| **BURL CAIN, WARDEN** | **CHIEF JUDGE HAIK** |
| | **MAGISTRATE JUDGE METHVIN** |

### _REPORT AND RECOMMENDATION_

_Pro se_ petitioner Jason Rebardi filed the instant petition for writ of _habeas corpus_ (28 U.S.C. §2254) on November 28, 2006. Rebardi is an inmate in the custody of Louisiana's Department of Public Safety and Corrections; he is serving the life sentence imposed following his 2002 aggravated rape conviction in Louisiana's Sixteenth Judicial District Court, St. Mary Parish. He attacks this conviction raising five claims for relief. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court. For the following reasons it is recommended that the petition be **DISMISSED WITH PREJUDICE.**

#### _Background_

Petitioner was indicted by the St. Mary Parish Grand Jury and charged with aggravated rape of a victim under the age of 12. [rec. doc. 17 – State Court Record [hereinafter SCR] at pp. 32 and 114-115] The State sought the death penalty. Petitioner's trial commenced in December 2001. [rec. doc. 17 – SCR, pp. 69-106] On December 25, 2001, he was found guilty as charged of aggravated rape. [rec. doc. 17 – SCR, pp. 101-102] The penalty phase commenced on December 26, 2001; at its conclusion the jury was unable to agree on the death sentence. [rec. doc. 17, SCR, pp. 104-105]

Accordingly, on January 29, 2002, petitioner was sentenced to serve life without benefit of parole.

[rec. doc. 17, SCR, p. 107]

Petitioner appealed his conviction to the First Circuit Court of Appeals arguing three

Assignments of Error:

> (1)     The trial court erred in failing to allow defense counsel to play a videotaped statement of one of the state's witnesses for the purpose of impeaching the witness's testimony;

> (2)     The trial court erred in denying defense counsel the right to present testimony about a statement made by an unavailable witness; and,

> (3)     The trial court erred in denying defendant's motion for a mistrial. [rec. doc. 7, petitioner's Exhibit A, p. 3; rec. doc. 17 – SCR, pp. 1076-1087]

On December 31, 2003, the First Circuit affirmed petitioner's conviction in an unpublished opinion.

*State of Louisiana v. Jason P. Rebardi*, 2003-0010 (La. App. 1 Cir. 12/31/2003), 864 So.2d 904

(Table). [rec. doc. 7,  Slip Opinion, petitioner's Exhibit B; rec. doc. 17, SCR, pp. 1110-1125][1]

---

[1] The court set forth four reasons why Assignment of Error Number 1 lacked merit:

> (1)      "... we are not convinced that counsel adequately complied with the foundational mandates of LSA-C.E. art. 613 as to most of the 'statements' cited to the court as subject to impeachment with the videotape at issue..."

> (2)     "... there is no showing that the witness's trial response to the particular question posed by defense counsel was inconsistent with the videotaped interview..."

> (3)     "... the details with which defense counsel hoped to impeach the child were clearly subsumed in the child's broad and repeated statements to Chief Richard that his father had **not** committed the rape in question and his frank admission at trial that he had lied to Chief Richard because he was afraid to tell the truth. Viewing the totality of the child's trial testimony, even if a proper foundation had been laid for introduction of excerpts from the videotape in question, which it was not, the trial judge would not have abused his discretion by not admitting the videotape."

> (4)     "... even an erroneous evidentiary ruling will not warrant reversal of a conviction unless the alleged error, when compared to the totality of the record, had a substantial effect on the rights of the defendant ... That was not the case here. Even if the trial judge had allowed defendant to play those excerpts from the videotape that he believed would constitute impeachment evidence, we are fully satisfied that it would not have altered the outcome of the case. The child already impeached himself concerning his statement to Chief Richard." *State v. Rebardi*, rec. doc. 7, Exhibit B, at pp. 9-10; rec. doc. 17, SCR, pp. 1115-1119]

As to Assignment of Error Number 2, the court concluded, "Before an out-of-court statement can be admitted

On January 26, 2004 petitioner submitted a *pro se* application for writs to the Louisiana

Supreme Court. [rec. doc. 7, Exhibit C]  On June 25, 2004 the Supreme Court denied writs. *State of*

*Louisiana v. Jason Rebardi*, 2004-0439 (La. 6/25/2004), 876 So.2d 831. [rec. doc. 7, Exhibit D; rec.

doc. 17, SCR, pp. 1126]

On June 6, 2005 petitioner filed a *pro se* Application for Post-Conviction Relief in the

Sixteenth Judicial District Court.  Petitioner argued three claims for relief:

(1)     The prosecution improperly manipulated a witness to prevent her from
        testifying on Petitioner's behalf in violation of his Sixth Amendment Rights;

(2)     The court cannot invoke the Fifth Amendment right not to testify for a
        witness; and,

(3)     Petitioner was denied the right to present a defense, in violation of the Sixth
        and Fourteenth Amendments.  [rec. doc. 7, Exhibit E, pp. 5, 5A, and 5B; rec.
        doc. 17, SCR, pp. 1128-1154]

---

pursuant to the residual rule allowing hearsay statements of an unavailable witness to be admitted under certain circumstances, a finding of trustworthiness is required. [citations omitted] In our view, the statement made by Michelle to defendant's investigator cannot be characterized as reliable or trustworthy. She apparently told the investigator that she visited the victim's home at night and that the victim and her cousin had sex while the defendant was asleep in his room. This contradicts the testimony of the victim, the victim's half brother, and the facts as related by defendant himself to investigating officers. It is difficult to believe that an attack by a third party, sufficiently brutal to cause the injuries sustained by [the victim], would not have been heard by the victim's half brother and defendant. Defendant was sufficiently awake and lucid to drive home that evening at about 8:00 p.m. and to call his sister for help at about 9:00 p.m. At trial, Michelle testified under oath that she and her cousin visited [the victim's] home earlier in the day, before the family went to the Rope, when the defendant was not present. If a sexual encounter between [the victim] and Michelle's cousin did occur in the afternoon, as described by Michelle under oath, it is inconceivable that the afternoon encounter, before the family went to the Rope, was the same encounter that caused the severe injuries treated when the victim went to the hospital that night. Numerous witnesses who saw the victim at the Rope testified to her conduct there and did not observe any evidence of trauma. In sum, we do not believe that Michelle's statement to Anderson has sufficient indicia of reliability to render it admissible under LSA-C.E. art. 804(B)(6).... Thus the trial judge did not err in refusing to allow defense witness, Harry Anderson, to testify to Michelle Chapman's statements to him." [rec. doc. 7, Exhibit B, p. 14; rec. doc. 17, SCR, p. 1119-1125]

As to the Third Assignment of Error, the court concluded, "The determination as to whether or not a mistrial should be granted ... is within the sound discretion of the trial court, and a denial of a motion for mistrial will not be disturbed on appeal absent an abuse of discretion [citations omitted]. After a thorough review of the record, we cannot say that the trial court erred in concluding that an admonition to the jury was sufficient in this case. In our view, there has been no showing that the momentary view of the witness crying was so prejudicial to warrant a mistrial." [rec. doc. 7, Exhibit B, p. 16; rec. doc. 17, SCR, p. 1119-1125]

On September 8, 2005, the district court denied the Application for Post-Conviction Relief and provided written Reasons for Judgment.[2] [rec. doc. 7, Exhibit F; rec. doc. 17, SCR, pp. 1192-1198]

On October 9, 2005 petitioner submitted a *pro se* application for writs to the First Circuit Court of Appeals. [rec. doc. 7, Exhibit G] On December 2, 2005, the First Circuit denied writs without comment. *State of Louisiana v. Jason Rebardi*, No. 2005-KW-2154 (La. App. 1 Cir. 12/2/2005) (unpublished). [rec. doc. 7, Exhibit H; rec. doc. 17, SCR, p. 1199]

On December 30, 2005 petitioner submitted a *pro se* writ application to the Louisiana Supreme Court. [rec. doc. 7, Exhibit I] While his writ was still pending, on July 20, 2006 petitioner

---

[2] In denying Claim One, the court noted, "Pursuant to La. C.Cr.P. art. 930.2, Petitioner has the burden of proving that the relief requested in his application for post-conviction relief should be granted. Petitioner has not provided any evidence that Michelle Chapman is in any way threatened by the prosecution during the court's recess. There are no supporting affidavits from either Ms. Chapman or anyone who may have witnessed a confrontation in the lobby between Ms. Chapman and prosecutors. Nor does petitioner state in his application that Ms. Chapman or anyone else told him of such a confrontation. The Court notes that Petitioner's appeal to the First Circuit included claims regarding the availability of Ms. Chapman's testimony. However, the above claim, raised in this application for Post Conviction Relief, was omitted from Petitioner's appeal. In addition, neither Petitioner nor his attorney at any time during the trial raised the issue that Ms. Chapman may have been threatened by prosecutors." Citing La. C.Cr.P. art. 930.4(B) ("If the application alleges a claim of which petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court may deny relief."), and noting that petitioner had knowledge of this claim at the time of trial and appeal, the court denied the claim noting, "Petitioner has failed to meet his burden of proof regarding this claim. In addition, he has not provided any reason why he failed to raise this claim during the trial or in his appeal to the First Circuit Court of Appeal, despite his prior knowledge that Ms. Chapman was allegedly threatened with a charge of perjury."

The court also denied relief on Claim Two pursuant to art. 930.4(B). In the alternative, the court addressed the merits of the claim and noted, "Had Ms. Chapman wanted to testify, she could have responded with 'no' when asked by her attorney if she wished to invoke her Fifth Amendment rights. Furthermore, even though she became emotional, she could have returned to the courtroom to continue her testimony after calming down. She did neither. The Court did not merely assume, on its own, that Ms. Chapman wished to invoke her Fifth Amendment right not to testify. Her attorney, who had the authority to do so, invoke those rights on her behalf. In addition, the Court witnessed Ms. Chapman's responses when Mr. Supple questioned whether she wanted to testify or invoke the Fifth Amendment."

Finally, the Court denied relief on Claim Three pursuant to the procedural default codified in art. 930.4(B), and, on the merits as follows: "In addition, the trial court fully supported its decision to exclude Ms. Chapman's testimony citing *State v. Parcels of Land*, 903 F.2d 36 (1st Cir. 1990), *McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), and *U.S. v. Colon-Miranda*, 992 F. Supp. 86, Dist. Ct. Puerto Rico (2/28/1988) as controlling in this case. The trial court has the ability to strike a witness' direct testimony at trial if the witness invokes her Fifth Amendment privilege, preventing cross-examination of her testimony. Ms. Chapman invoked her Fifth Amendment privilege after her direct testimony, but before cross-examination by the State. The trial court, therefore, was correct in excluding the testimony already given at trial." [rec. doc. 7, Exhibit F]

submitted a "Supplement to Writ of Certiorari and Review." [rec. doc. 7, Exhibit J] On September 29, 2006 the Supreme Court denied writs without comment. *State of Louisiana ex rel. Jason Rebardi v. State of Louisiana*, 2006-0699 (La. 0/29/2006), 937 So.2d 855. [rec. doc. 7, Exhibit K; rec. doc. 17, SCR, p. 1201]

Petitioner filed his federal *habeas* petition on November 17, 2006 arguing the following claims for relief:

> ***Claim Number One*** – The trial court erred in failing to allow defense counsel to play a videotaped statement of one of the state's witnesses for the purpose of impeaching the witness's testimony. [rec. doc. 1-1, p. 12]
>
> ***Claim Number Two*** – The trial court erred in denying defense the right to present testimony about a statement made to a detective by a witness who allegedly asserted her Fifth Amendment privilege at trial, which denied the defendant the right to present a defense. [rec. doc. 1-1, p. 15]
>
> ***Claim Number Three*** – The trial court erred in denying defendant's motion for mistrial. [rec. doc. 1-1, p. 23]
>
> ***Claim Number Four*** – The prosecution improperly manipulated a witness to prevent her from testifying on petitioner's behalf in violation of his Sixth Amendment right. [rec. doc. 1-1, p. 25]
>
> ***Claim Number Five*** – The witness never stated that she was invoking her Fifth Amendment right not to testify. [rec. doc. 1-1, p. 31]

On March 1, 2007, the undersigned completed an initial review of the pleadings and exhibits and observed that some of petitioner's claims were not fairly presented to the Louisiana Courts.[3]

---

[3] The undersigned made the following observations: "Claim Number One, concerning the trial court's refusal to permit the introduction of a prior inconsistent video-taped statement of a witness, is similar to Assignment of Error Number One argued on direct appeal. However, as noted above, when petitioner litigated this claim on direct appeal, he argued no violations of United States law and instead argued only violations of Louisiana law. He now claims for the first time that the evidentiary ruling '... violated the Defendant's 6th and 14th Amendments.' [rec. doc. 1-1, p. 13] It thus appears that petitioner did not fairly present the substance of this federal claim to the Louisiana courts. If that is indeed the case, Claim Number One has not been properly exhausted.

In Claim Number Two petitioner argues that he was prohibited from presenting a complete defense when the trial court refused to allow an investigator to testify as to the substance of certain out-of-court statements made by witness Michelle Chapman. (Petitioner argues this claim as follows, 'Thus, defendant should have been allowed to present

The undersigned directed petitioner to amend his pleading to provide a detailed response demonstrating that federal *habeas* review of any of his claims is not barred by the exhaustion, or "technical exhaustion" / procedural default doctrines.[4] [*id*.]

---

[Michelle Chapman's] statements through the testimony of the detective. The trial court's erroneous ruling gutted defendant's right to present a defense.' [rec. doc. 1-1, p. 17]) This claim was argued as Assignment of Error Number Two on direct appeal. As noted above, petitioner made a vague and passing reference on appeal to his Sixth Amendment '...right to present a defense...' but otherwise argued that the trial court misapplied Louisiana law. It likewise appears that this aspect of Claim Number Two was not properly exhausted.

Petitioner also seems to argue that his inability to present Michelle Chapman's testimony resulted in the denial of his right to present a defense. [rec. doc. 1-1, pp. 21-22] ('The State prevented the witness from testifying herself, then objected to the hearsay evidence when the witness was declared unavailable. The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.' [*id*.]) This aspect of the claim was arguably presented as Claim Three in petitioner's Application for Post-Conviction Relief, and was therefore arguably exhausted.

In Claim Number Three petitioner argues that the trial court erred when it failed to order a mistrial following witness Chapman's sudden departure from the court room. Petitioner argues that '... the denial of a mis-trial resulted in a violation of [his] due process rights ... [and] substantially prejudiced his guaranteed right to a fair trial.' [rec. doc. 1-1, p. 25] A similar claim was argued as Assignment of Error Number Three on Appeal. However, as shown above, when petitioner presented this argument to the Louisiana courts, he argued no violations of federal law and instead maintained only that the trial court's ruling violated La. C.Cr.P. art. 775. It thus appears that petitioner failed to submit the substance of this federal claim to the Louisiana courts and therefore Claim Number Three was not fully exhausted.

In Claim Number Four petitioner argues that the prosecution improperly 'manipulated' a witness to prevent her from testifying. This claim was arguably raised as Claim One in petitioner's Application for Post-Conviction Relief. However, it appears that petitioner now seeks to rely on evidence not presented to the state courts to support this claim.

In Claim Number Five petitioner argues that Ms. Chapman, the witness in question, did not personally invoke her Fifth Amendment privilege. In his Application for Post-Conviction Relief, petitioner argued that the trial court erred when it invoked the witness' Fifth Amendment privilege. (Petitioner argued, 'It was a due process violation for the court to assume that the witness had invoked her right not to testify.' [Exhibit E, p. 6] ) While both claims are similar, it appears that the petitioner has reformulated his claim and that it may not be identical to the claim litigated in the Louisiana courts.

In short, it appears that the substance of several of petitioner's present claims were not fairly presented to the Louisiana courts either because petitioner did not raise the substance of the federal constitutional claims in the Louisiana courts, or because petitioner has now alleged new factual support for his claims." [see rec. doc. 6, pp. 5-7].

[4] Unexhausted claims, i.e., those claims which were not "fairly presented" to the state courts, may be considered "technically" exhausted if the habeas petitioner is now prohibited from litigating those claims in the state's court because of some procedural rule. If that is so, then those "technically" exhausted *habeas* claims might be considered procedurally defaulted. The procedural default doctrine bars federal *habeas corpus* review if the state courts would now refuse to address a *habeas* petitioner's unexhausted federal claims because litigation of those claims would be barred by state procedural rules. Federal *habeas* review of "technically" exhausted but now procedurally defaulted claims is barred "...unless the prisoner can demonstrate cause for the default and actual prejudice as result of the

On March 26, 2007 petitioner filed an amended complaint, a memorandum in support of his complaint, and various additional exhibits. [rec. doc. 7]  Petitioner argued that the claims identified above as having been unexhausted but now technically exhausted and procedurally defaulted were in fact fairly presented to the Louisiana courts and therefore fully exhausted. In the alternative, he argued that he is innocent of the offense and therefore the failure to address the merits of his claims would result in a miscarriage of justice. [rec. doc. 7-1] In support of his claim of actual innocence, petitioner provided the following:

(1)    The affidavit of Michelle Chapman dated January 31, 2006 wherein she alleged that she was "... approached by one of the prosecutors and told that if I continue to testify that I would be charged with perjury...", then approached by Attorney James Supple who "... told me that if I did not plead the Fifth Amendment that I would be charged with perjury and sent to jail..." She also alleged that days prior to trial she "... had a conversation with Richard Barrack and was threatened." According to Ms. Chapman's affidavit, "He told me not to say anything about him in court. Richard was the one that my friend [A.B.[5]] told me she had sex with...." [rec. doc. 7, Exhibit 1];

(2)    The affidavit of Sonya Huffman dated November 6, 2006 in which she claimed that [A.B.] lived with her for a period of six to eight weeks sometime after the petitioner's trial; she also claimed that A.B. "... told me that she had lied when she testified at trial. She told me that she had sex with Richard Barrack but was afraid to tell the truth at that time, as he had threatened her..." She also claimed that she was discouraged from obtaining A.B.'s affidavit to that effect by a person named Candy McVay who assured her that the "Innocence Project" would "handle it," however, A.B. was murdered and did not execute such an affidavit [rec. doc. 7 Exhibit 2];

(3)    The affidavit of Justin Rebardi Bowyer dated November 6, 2006 in which he claimed "I had given a prior statement indicating that I had been asleep and

---

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750-51, 111 S.Ct. 2546,  115 L.Ed.2d 640 (1991).

[5] La. R.S.46:1844(W) provides in part, "In order to protect the identity ... of crime victims who are minors... and of victims of sex offenses, all public officials and officers and public agencies ...shall not publicly disclose the name ... or identity of crime victims who at the time of the commission of the offense are minors.. or of victims of sex offenses." In accordance with that directive, the undersigned has not identified by name the minor child who was the victim of this offense.

had not witnessed any events that allegedly happened the night of July 11, 1999. I was questioned by a Detective James Richard of the Berwick Police Department for approximately an hour. I consistently denied seeing anything at all, no less than six times, despite repeated questioning by the Detective." According to Justin, he "... was intimidated, coerced, and pressured to change my testimony ..." He therefore changed his "story" and "... stated I saw my dad rape my sister which was not true..." [rec. doc. 7, Exhibit 3];

(4)     The affidavit of Gretta A. Rebardi dated November 1, 2006 wherein she alleged, "... I have serious reason to believe that my daughter ... gave false information concerning the things that took place the night in question..." [rec. doc. 7, Exhibit 4]; and,

(5)     A Patterson Police Department incident report dated July 8, 1997 in which it was reported that A.B. recanted a previous accusation of molestation she had alleged with respect to the petitioner. This document was previously introduced into evidence as Defendant's Exhibit 6 in petitioner's trial in the Sixteenth Judicial District Court. [rec. doc. 7, Exhibit following Exhibit 4]

In due course, the petition was served and on July 27, 2007 the respondent filed an Answer, memorandum, and a certified copy of the relevant portions of the State court records. [rec. doc. 17] On August 15, 2007, petitioner "traversed" the respondent's assertions. [rec. doc. 18]

### *Law and Analysis*

### *1. Time Bar*

Respondent maintains that this petition is barred by the timeliness provisions of the AEDPA codified at 28 U.S.C. §2244. The statute provides a 1-year limitations period for *habeas corpus* petitions filed pursuant to 28 U.S.C. §2254. The limitation period generally runs from "... the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. §2244(d)(1)(A). The statute also provides, "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. §2244(d)(2).

Respondent claims that petitioner's writ applications to the First Circuit Court of Appeals and the Louisiana Supreme Court seeking review of his Application for Post-Conviction Relief were untimely. The record reflects, and Respondent admits, that petitioner's judgment of conviction became final for AEDPA purposes on September 25, 2004, 90-days after June 25, 2004, the date that the Louisiana Supreme Court denied writs on direct review. See *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir.1999) (28 U.S.C. § 2244(d)(1)(A) takes into account the time for filing a *certiorari* petition in the United States Supreme Court in determining when a judgment becomes final by the conclusion of time for seeking further direct review.), *cert. denied*, 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000)).

Petitioner filed his application for post-conviction relief on June 6, 2005 thus tolling the limitations period pursuant to §2244(d)(2). [rec. doc. 7, Exhibit E, pp. 5, 5A, and 5B; rec. doc. 17, SCR, pp. 1128-1154] However, a period of over 8 months elapsed before statutory tolling commenced.

On September 8, 2005, the district court denied the Application for Post-Conviction Relief and provided written Reasons for Judgment. [rec. doc. 7, Exhibit F; rec. doc. 17, SCR, pp. 1192-1198] Petitioner sought review in the First Circuit Court of Appeals on October 9. Respondent claims that this filing was one day later than the 30 day period provided by Rule 4-3 of the Uniform Rules of the Courts of Appeals. However, this is clearly not the case. La. C.Cr.P. art. 13 provides in part, "In computing a period of time allowed or prescribed by law or by order of court, the date of the act, event, or default after which the period begins to run is not be included. The last day of the period is to be included, unless it is a legal holiday, in which event the period runs until the end of the next day which is not a legal holiday."

Thus, the 30-day period commenced on September 9, 2005 and ended on Saturday, October 8, 2005. Pursuant to art. 13, petitioner had until Monday, October 10 to file his application for writs. Respondent has submitted no evidence to establish that petitioner's writ application was untimely and therefore, the undersigned concludes that petitioner was able to toll limitations during the pendency of his writ application in the Court of Appeals – or until December 2, 2005 when the First Circuit denied writs and presumably sent notice of judgment to the petitioner. *State of Louisiana v. Jason Rebardi*, No. 2005-KW-2154 (La. App. 1 Cir. 12/2/2005) (unpublished). [rec. doc. 7, Exhibit H; rec. doc. 17, SCR, p. 1199] Thereafter, it appears that petitioner filed his application for *certiorari* on December 30, 2005 [rec. doc. 7, Exhibit I], well within the 30-day period of limitation provided by Louisiana Supreme Court Rule X, §5(a). Petitioner's writ remained pending in the Louisiana Supreme Court until September 29, 2006, when the Supreme Court denied writs without comment. *State of Louisiana ex rel. Jason Rebardi v. State of Louisiana*, 2006-0699 (La. 9/29/2006), 937 So.2d 855. [rec. doc. 7, Exhibit K; rec. doc. 17, SCR, p. 1201] Statutory tolling pursuant to §2244(d)(2) ceased and the AEDPA limitations period resumed on September 30, 2006. Thereafter, a period of approximately 48 days elapsed before petitioner filed the instant petition on November 17, 2006. Thus, a period of about 8 ½ months elapsed between finality of judgment and the commencement of the statutory tolling period; once tolling ceased, another 1 ½ months elapsed before petitioner filed his federal petition. Since less than 1-year elapsed un-tolled, petitioner's federal petition is timely.[6]

---

[6] In making these calculations, the undersigned has given petitioner the benefit of the "mailbox rule" and has presumed, in the absence of evidence to the contrary, that the date petitioner signed his pleadings was the date he submitted the pleadings to prison authorities for mailing. Under the "mailbox rule," the date of signing is the earliest date that the pleading could be said to have been filed. In *State ex rel. Egana v. State*, 00-2351 (La.9/22/00), 771 So.2d 638, the Louisiana Supreme Court approved of the use of the "mailbox rule" referred to in *Houston v. Lack*, 487 U.S. 266, 276, 108 S.Ct. 2379, 2385, 101 L.Ed.2d 245 (1988)(a *pro se* prisoner's pleading is "filed" at the moment of delivery to prison authorities for forwarding to the court) for *pro se* filings.

***2. Exhaustion/Technical Exhaustion and Procedural Default***

Upon completion of the initial review, the undersigned expressed some concern that petitioner's claims were not properly exhausted and were now procedurally defaulted. After full review, I conclude the claims are procedurally defaulted.

As previously noted, Claim One (the trial court's refusal to permit the introduction of a prior inconsistent video-taped statement of a witness), Claim Two (trial court prohibited petitioner from presenting a complete defense when it refused to allow an investigator to testify regarding the substance of certain out-of-court statements made by witness Michelle Chapman), and Claim Three (the trial court erred when it failed to order a mistrial following witness Chapman's sudden departure from the court room) were raised on direct review as Assignments of Error 1, 2, and 3.

The federal nature of Claims 1-3 was not presented to the Louisiana courts, and therefore the claims remain unexhausted. The state court records establish the following: (1) In support of Assignment of Error Number 1, appellate counsel cited La. C.E. art. 613 as interpreted by *State v. Hicks*, 554 So.2d 1298 (La. App. 1 Cir. 1989), *writs denied*, 559 So.2d 1374 (La. 1990). [rec. doc. 7, Exhibit A, pp. 5-6; rec. doc. 17, SCR, pp. 1081-1082] (2) In support of Assignment of Error Number 2, counsel argued, "A criminal defendant has a constitutional right to present a defense. U.S. Const. Amend. 6; La. Const. Art. 1 §16." Thereafter, counsel, quoting *State v. Gremillion*, 542 So.2d 1074 (La. 1989) argued, "'While hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted.'" [rec. doc. 7, Exhibit A, p. 8; rec. doc. 17, SCR, pp. 1082-1086] Finally, as to Assignment of Error Number 3, counsel argued only that the trial court's ruling

violated La. C.Cr.P. art. 775. [rec. doc. 7, Exhibit A, p. 9; rec. doc. 17, SCR, pp. 1082-1086]

In other words, with respect to the claims raised as Assignments of Error on direct appeal, petitioner did not "fairly present" any federal claims to the State courts. See *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (A claim is not "fairly presented" if the state petition/appeal fails to provide citation to any case, statute, or constitutional provision that might have alerted the state's court to the alleged federal nature of the claim.); *Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement.")

Further, while Claim Four (prosecution improperly manipulated a witness) was raised in petitioner's State court post-conviction proceedings, his federal *habeas* petition now relies on evidence which was not presented to the state district court. [see rec. doc. 7, Exhibit 1, the Affidavit of Michelle Chapman.] This is particularly troubling in light of the fact that the State court denied this claim based on petitioner's failure to carry the burden of proof; in fact, the State court specifically noted that petitioner failed to provide "... any evidence that Michelle Chapman was in any way threatened by the prosecution during the court's recess." Further, the state court specifically noted the absence of any "supporting affidavits from either Michelle Chapman or anyone who may have witnessed a confrontation ... between Michelle Chapman and prosecutors." [rec. doc. 7, Exhibit F, rec. doc. 17, SCR, at p. 1194] Of course, the law is clear, "[a] *habeas* petitioner fails to

exhaust state remedies 'when he presents material additional evidentiary support to the federal court that was not presented to the state court.'" *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003), citing *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir.1996). Petitioner did not present the affidavit of Michelle Chapman to the State court and therefore Claim 4 was not properly exhausted.

Finally, with regard to Claim 5, it appears that petitioner reformulated his claim and that it may not be identical to the claim litigated in the Louisiana courts.

Clearly, petitioner has failed to exhaust State court remedies with respect to his claims for relief. While these claims remain unexhausted, all could be said to be "technically exhausted" since petitioner cannot now return to the Louisiana courts to litigate these claims.[7] *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570-71 n. 28, 71 L.Ed.2d 783 (1982); 28 U.S.C. §2254(c).

When state-court remedies are rendered unavailable by the petitioner's own procedural default, federal courts are normally barred from reviewing those claims. See *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("[I]f the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, ... [then] there is a procedural default for purposes of federal *habeas*...." *Id.* at 735 n. 1, 111 S.Ct. at 2557 n. 1.)

The procedural default doctrine bars federal *habeas corpus* review when a state court declines to address a petitioner's federal claims because the petitioner has failed to follow a state

---

[7] Petitioner could not now raise these claims in a second Application for Post-Conviction Relief since under Louisiana law, any future attempt to raise this claim in an Application for Post-Conviction Relief would likely be dismissed as repetitive under La. C.Cr.P. art. 930.4(D) (A successive application may be dismissed if it fails to raise a new or different claim.") or (E) (" A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application."), or as time-barred by the provisions of La. C.Cr.P. art. 930.8. That statute provides a two-year period of limitations for filing applications for post-conviction relief and that period is generally reckoned from the date that the applicant's judgment of conviction becomes final under Louisiana law. Petitioner's judgment of conviction became final under the provisions of Louisiana law in June 2004 when the Louisiana Supreme Court denied his writ application on direct review.

procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991). "[I]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal *habeas* review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750-51. This doctrine ensures that federal courts give proper respect to state procedural rules. *Id.*

It is reasonable to conclude that petitioner is now unable to litigate Claims 1-5 in the courts of Louisiana, and that any attempt to litigate these claims would result in dismissal on procedural grounds. Therefore, these claims must now be considered procedurally defaulted. See *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir.1993), (cited with approval in *Sones v. Hargett*, 61 F3d 410, 416 (5ᵗʰ Cir. 1995)), ("[I]f it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping- pong' and hold the claim procedurally barred from *habeas* review").

### a. "Cause and Prejudice"

In order for petitioner to avoid a procedural bar he must show "cause and prejudice" for the default by showing that "some objective factor <u>external to the defense</u>" prevented the petitioner from properly raising the claims in state court. *McClesky v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)(quoting, *Murray*, 477 U.S. at 488) (emphasis supplied).

Petitioner argues that the ineffectiveness of his court-appointed appellate counsel was the cause of his default. However, while a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, petitioner

does not explain how counsel's failure to argue the instant federal claims on appeal amounts to deficient performance. Petitioner does not allege any specific facts suggesting that his court-appointed appellate counsel was ineffective under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 890 L.Ed.2d 674 (1984), as a result of failing to raise the federal constitutional claims presented to this court.

Nevertheless, even if it is assumed that petitioner's counsel was ineffective when he failed to argue federal claims in his appeal to the Louisiana Courts of Appeal, petitioner is still not entitled to review because, "[i]n addition to cause, [a procedurally defaulted *habeas* petitioner] must show actual prejudice to overcome the procedural bar." *United States v. Guerra*, 94 F.3d 989, 994 (5th Cir.1996) (internal quotations omitted). "The movant makes this showing where he demonstrates that, <u>but for</u> the error, he might not have been convicted." *Id.* (emphasis supplied); See also *Pickney v. Cain,* 337 F.3d 542, 545 (5th Cir. 2003). Even if petitioner were to establish cause for his default, it appears unlikely that he could establish prejudice since he has provided no reason to suspect that the Louisiana courts would have ruled favorably on these claims even if the federal aspect of the claims had been fairly presented to Court of Appeals and the Supreme Court.

With regard to Claims 4 and 5, petitioner can point to no "cause" for the default of these claims since he himself was responsible for failing to provide sufficient evidence in support of his Application for Post-Conviction Relief, and for reformulating his state court claim.

### b. Fundamental Miscarriage of Justice – "Actual Innocence"

A petitioner may obtain federal review of the technically exhausted but procedurally defaulted claim by showing that the failure to consider the claim will result in a "fundamental miscarriage of justice." In order to make such a showing, the *habeas* petitioner must show,

"... as a factual matter, that he did not commit the crime of conviction." *Fairman v. Anderson*, 188 F.3d 635 (5th Cir.1999) (citing *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir.1995). To establish such actual innocence, petitioner must "support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

Petitioner claims "actual innocence" but he has not provided any new and reliable evidence of his innocence. Instead, he provided unreliable and probably inadmissible hearsay evidence along with purported recantations of several key witnesses, including the victim. More specifically, he relies on the following:

(1) the affidavit of Michelle Chapman, which, with respect to petitioner's guilt or innocence merely states, "A few days prior to trial I had a conversation with Richard Barrack and was threatened. He told me not to say anything about him in court. Richard was the one that my friend [the victim A.B.] told me she had sex with. Richard didn't want me to say anything about it because he was afraid he would be charged with having sex with an underage girl." [rec. doc. 7, Exhibit 1, ¶3];

(2) the affidavit of Sonya Huffman[8] who claimed that A.B. resided with her for a period of 6-8 weeks during the summer of 2004 and during which time she advised Huffman "... that she had lied when she testified at trial." According to Huffman, A.B. "... told me that she had sex with Richard Barrack, but was afraid to tell the truth at the time, as he had threatened her." Finally she swore that A.B. "... admitted she never had sex, nor was she abused, at any time by her stepdad, Jason. She admitted that Richard Barrack had sex with her and that he had threatened her not to tell anyone about him." [rec. doc. 7, Exhibit 2, ¶¶3-4];

(3) the affidavit of Justin Rebardi Bowyer in which he recanted his trial testimony and claims that he falsely testified at the petitioner's trial because he was "intimidated, coerced, and pressured to change [his] testimony." [rec. doc. 7, Exhibit 3]; and

---

[8] Sonya Huffman is not otherwise identified, however, it is assumed that she is the same individual who testified at trial – Sonya Rebardi Evans.

(4) the affidavit of Gretta A. Rebardi which merely states, "... I have serious reason to believe that my daughter [A.B.], gave false information concerning the things that took place the night in question. . ." [rec. doc. 7, Exhibit 4]

The affidavits of Huffman and Michelle Chapman have in common the claim that the young victim of this crime privately recanted her accusation and trial testimony sometime prior to her death. Through his affidavit Justin Rebardi Bowyer, petitioner's son, likewise recanted his sworn trial testimony. Of course, *habeas* courts must view recanting affidavits with extreme suspicion. *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996). Further, it is not entirely certain whether the affidavits of Huffman and Ms. Chapman would be admissible as evidence in this or any other proceeding.[9]

In addition, all of these affidavits, and indeed the earlier proffered testimony of Michelle Chapman, contain major inconsistencies. There was ample evidence of petitioner's guilt adduced at trial which is not overcome by the "new" evidence submitted by petitioner. The trial transcript shows the following:

**Sonya Rebardi Bergeron Evans** (hereinafter referred to as "Sonya"), petitioner's sister testified that petitioner, her brother Jodie, Jodie's girlfriend Sheree, and her children, along with the victim and her brother Jason stopped by her residence on the evening of July 11, 1999. She was uncertain as to the time but was certain that it was "right at dark," sometime between 8:00 p.m. and

---

[9] The statements – insofar as they purport to be recanting testimony by A.B. – are hearsay. The declarant is, of course, now apparently unavailable. However, the victim's recanting statements, since when made tended "... to expose the declarant [A.B.] to criminal liability [perjury] and [are] offered to exculpate the accused [are] not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement..." See Fed. Rules of Evidence Rule 804(b)(3); La. C.E. art. 804(b)(3). The fact remains, as is shown hereinafter, that petitioner has provided NO evidence to corroborate his theory that Barrack, and not he, had sexual intercourse with the victim on July 11, 1999.

9:00 p.m.[10]  This group stopped by her house after having spent some time swimming at a local spot called "the Rope." [id., p. 438] They left Sonya's home shortly after they arrived.  [rec. doc. 17, SCR, pp. 427-428]

Sometime later, Sonya received a telephone call from petitioner who advised her that he thought A.B. was starting her menstrual period. Sonya went to petitioner's house and found A.B. in the bathroom. According to Sonya, she was "bleeding a little bit" and so, she applied a "pad." Petitioner wanted to transport A.B. to the hospital, but Sonya took her instead. [id., 429] Justin, petitioner's son, was awake and playing a video game when she arrived at the petitioner's house. [id., p. 444] While she was being examined in the emergency room, A.B. advised Sonya that petitioner caused her injuries. [id. 431]

**Denise Billelo**, a registered nurse, was on duty at the hospital emergency room when Evans brought A.B. in for treatment on the evening of July 11, 1999. According to Billelo, Sonya brought the child to the hospital at 10:30 p.m. According to Billelo, the victim was bleeding profusely upon arrival. In fact, Billelo testified that "... this child had blood just coming out of her. Dripping down her legs, both legs, on the floor." She later described it as "... very profuse..." with "... large clots..." [id. , pp. 446-447] Billelo testified that the victim was losing so much blood that the emergency room staff had to start an IV on her. According to Billelo, Sonya stated, "I am going to kill that son-of-a-bitch." [id. p. 448] A.B. then advised that her "daddy" – the petitioner – had raped her and was responsible for her injuries. [id.] More specifically, A.B. told Ms. Billelo, "Daddy put it in my private part. My daddy is going to kill me if I tell... When he put it in me, I felt something pop and

---

[10] Sunset was at 8:08 p.m. on Sunday, July 11, 1999; twilight ended at 8:35 p.m. See U.S. Naval Observatory Astronomical Applications Department http://aa.usno.navy.mil/cgi-bin/aa_pap.pl

blood started running down my legs and all over the floor, and I got in the bathtub and big clots were coming out." [id., p. 450]

**Officer Paul** of the Berwick Police Department testified that she spoke to Sonya at the Lakewood Hospital. Sonya advised her that when she went to petitioner's home, she discovered A.B. was standing in the bathroom and bleeding heavily down her legs. [id., p. 483] She testified that she and Sgt. Leonard then went to petitioner's house to investigate. According to Paul, petitioner advised the officers that A.B. slept in the first room and that he and his son "alternated bedrooms." According to Paul, they found clothing scattered on the floor in the first room, along with a patch of dried blood and a bloodstained sock. There was no blood on the mattress. They then looked at the bathroom where they discovered blood on the floor, blood stained clothes, and a tissue with blood located in the lavatory. She then went into the second bedroom where she and Sgt. Leonard discovered a blood stain on the mattress. The mattress had been flipped over concealing the blood stain. [id., pp. 496-497] She stated that there were no sheets in the room, but there was a small amount of blood on the headboard and wall. [id.]

**Sgt. Leonard** of the Berwick Police Department arrived at petitioner's house at 12:30 a.m. on July 12. [id. , p. 511] After advising petitioner of his *Miranda* rights, he obtained a statement from him. Leonard testified,

> I did advise him that we were investigating a complaint, where his eleven year old daughter was at the hospital, and it was thought by the physicians that some type of sexual activity had occurred.
>
> I went on to ask him what had taken place and he immediately denied any wrong doing with his daughter.
>
> I then asked him what had taken place that day, during the day, and he indicated that him, his son, and [A.B.] had been out at The Rope, which is on the [Bayou] Teche, where they swing out, fall into the water; like a family gathering of sorts.

I then asked him if [A.B.] was hurt in any type of way out there, was she injured. He indicated no.

I then asked him if, upon arriving home later that night, did [A.B.] have any company. He indicated, no.

I asked him if he had any company to arrive at the residence. He indicated no, it was just him, his son and [A.B.] at the residence that night. [id. , pp. 512-513]

According to Sgt. Leonard, when he arrived at petitioner's residence, Justin was sleeping on the couch. [id.] Leonard observed items of clothing in the bathroom that were saturated with blood; he also observed blood in the bath tub and a large blood clot in the tub. [id., p. 514] He then went into the adjacent bedroom and discovered a twin sized bed and an ashtray with several cigarette butts. He observed blood spatter on the headboard and wall. [id.] He flipped the mattress over and discovered a large blood stain. [id., p. 515] According to Leonard, petitioner made contradictory statements as to who used the bedroom. [id., p. 521] Leonard also testified that when he initially confronted petitioner in his home, petitioner advised that he was sleeping or "laying" in the living room that night on the couch. [id., p. 520 - 521; 526-527] He also advised that he flipped the mattress because he did not want to sleep in blood that night. [id., p. 527]

**Dr. Rand Dooley**, an obstetrician/gynecologist at the Lakewood Hospital testified that he examined and treated A.B. in the late evening hours of July 11 and early morning hours of July 12, 1999. [id., p. 545] He testified that A.B. told him that "the male person who was in charge of her" told her that he was going to hurt her that night, and, that in due course, he penetrated her, something popped and a lot of bleeding began. [id., p. 547] According to Dr. Dooley, prior to surgery, A.B. had lost 200-400 cc's of blood. [id. , p. 548] In order to conduct a thorough examination, Dr. Dooley placed A.B. under anesthesia. Upon further examination he discovered that "... her legs were stained with blood; the vulva was stained with blood; the anus had blood and the

buttocks had blood... there was more blood in the vagina; there were lacerations throughout the vagina; there were severe lacerations near the cervix; and there were pumping blood vessels in the left deep aspect of the vagina." [id.]During the operation, A.B. lost another 100 cc's of blood. He noted that the laceration under the cervix was 3 inches long and very deep. He noted that the mucosa around the cervix was completely lacerated and that the hymenal ring had been lacerated prior to the event that caused her trauma. [id., pp. 549] He described the surgery as follows, "There was a lot of bleeding. The vaginal walls were so lacerated it was very difficult to take suture and tie and get stoppage of the bleeding, because you are working in stuff that looks like ground meat, if you can imagine that shredded. Most of the lacerations were repaired but I couldn't stop all of the bleeding because there was nothing to tie a suture to at this point. Every time I would put my suture in, it would just pull it right on through, because there was really no meat or muscle to grasp." [id.] Dooley opined that the injuries he observed were caused as follows, "... I would assume that something wide had to go in there, with a lot of force at one time to cause all of this tissue to separate all over... could a penis do this; yes. Could a blunt object to this; yes." [id., p. 552]

**Assistant Chief Richard** of the Berwick Police testified that he went to petitioner's home on the morning of July 12, 1999. Petitioner was not home. [id., p. 560] Richard also testified that on that date he took a statement from Sonya Rebardi Evans. According to Richard, Sonya told him that petitioner, A.B., and Justin visited with her on the evening of July 11, but they left her house at approximately 8:00 p.m. She then received a telephone call from petitioner sometime between 9:00 and 10:00 p.m. Petitioner advised her that A.B. was bleeding and Sonya could hear the child crying in the background. When she arrived at petitioner's home, she found A.B. standing in the bathtub, bleeding so profusely that she decided to take her to the hospital. While at the hospital, A.B. told

Sonya that petitioner caused her injuries. [id., pp. 582-584] Richard further testified that in the two year period from July 1999 to the date of the trial, no one had come forward with a name of another suspect other than the petitioner. [id., p. 596]

**Arthur Young** of the Acadiana Crime Lab testified that the crime lab analysis established that A.B.'s blood stained the mattress and floor of the large bedroom in petitioner's home. [id., p. 688] With regard to the sheets removed from the bed in the large bedroom, Young testified that he discovered "... that the two fluids, one from A.B. and one from Jason Rebardi, unless the two were capable of depositing DNA, exactly one on top of the other, to the point where they did not miss, because I tested three samples around it – unless they were capable of doing that, the only other conclusion was a fluid from A.B. and a fluid from Jason Rebardi, were mixed together and then deposited together, and that's why the two occupied the same exact space without any contamination of the surrounding area." He also testified that the fluid deposited by petitioner was semen. [id., pp 698- 699] Finally he testified that there was no other DNA – other than that of A.B. and the petitioner – which was detected in any of the samples obtained from petitioner's residence. [id., p. 709]

**Chief Duval Arthur** of the Berwick Police Department testified that he was present when a search of petitioner's home was conducted. According to Arthur, the police "... were looking for things like stains, blood spatters, traces of blood, things of that nature." The police authorities searched each room and discovered blood stains in the large bedroom leading into the bathroom and in the bathroom as well. [id., p. 738]

The young victim, **A.B.**, testified that petitioner, and only petitioner raped her on the evening of July 11, 1999. [id., pp. 739-786] She specifically testified that upon the family's return from The Rope, she fixed sandwiches for petitioner and her brother Justin. She then testified,

> Well, then everybody was watching T.V., and then everybody had got tired and I think, was going to bed. And he [petitioner] had told me to come in the room, and I think Justin was laying down on the couch, going to sleep... The big room where the biggest bed is. So when I went in the room, a little bit later after Justin fell asleep, Jason [petitioner] told me to take my underwear off and my shorts. After he told me to do that, he told me to lay on the bed... And at first, I said, no. And then he grabbed me by my throat until I couldn't breathe... He told me to sit on it. And he said, not in you're [sic] a- - ; he said, not in your butt, in your other. .. I was like, no, it is going to hurt. At that time I had never done none of that before. I was eleven years old and I was scared... So then he slapped me; which when I went to the hospital I had a black eye. and after that, Jason had pushed me off the bed, because I wouldn't... After that I was in the corner and I was saying, I hate you, I hate you. And he just kept saying, so what, so what, I don't care. You think that hurts me? And then it got to the point where he told me to get back on the bed. So I stood up, and I was crying; and he told me to sit on it, and I was like, no, I don't want to. I don't want to. And Jason picked me up and slammed me on his private. And when I said I was bleeding, he said, that's good...

She testified that it hurt and that she immediately started bleeding and he told her to get in the bathtub where she awaited the arrival of her Aunt Sonya. [id. pp. 748-749] She testified that no other persons came to the house after they returned from The Rope. [id., p. 750; 773]

**Justin Rebardi** testified that he and the petitioner went to Kentucky shortly after A.B. was hospitalized. [id., p. 813] He testified that upon their return from The Rope, it was just he, the petitioner, and A.B. at the house until Sonya arrived later on. He testified without equivocation that the petitioner raped A.B. [id., p. 814]

In testimony that was ultimately stricken, **Michelle Chapman** testified as follows. She saw and spoke with A.B. on July 11, 1999, but before, not after, they returned from The Rope. [id., p.

866] She testified that she and her cousin, Richard Barrack "...went and walked to [A.B.'s] house that day..." [id.]

At a hearing held outside the presence of the jury, she testified,

Okay, my cousin Richard, was at my house before that had happened and I asked him if he would bring me, walk me down to [A.B's] house with him. Me and him went to A.B.'s house and my Uncle Jason [petitioner] was in the boat with little Justin. They went to the boat, they were in the boat.

And he had – Richard, we started sitting down, and talking, and we was getting along; it was [A.B.'s]  second time meeting my cousin, Richard and she told me that she like him. And I was like, okay.

And then he had stopped me and asked me if I would go to the store and go get them a Coke. I said, yea, and I asked him for a dollar, to see if I can go get me a Coke, too; and he gave me money for going to get a Coke.

So I went and walked to Myrtle's, and when I got back [A.B.] was sitting on the couch and Richard was gone.

She was shaking, and I asked her what was wrong. She said, well, I did it. I said, you did what? And she goes, well, me and Richard slept together. And I said, well what happened?

And she was like – she said that – something like – she said that whenever they slept together that he had stuck it in half-way, and she couldn't take it no more because it was hurting her, and he just rammed it in real hard. ...

She had went to the bathroom after, and she showed me blood on toilet paper, and that's all she had showed me.

When asked to state the time these events occurred, she stated, "I would say at least about 4:30, 5:00 o'clock..." She said she knew it was this time because she was supposed to be home before 7:00 p.m. and it was still light outside. She then testified that she did not accompany the family to The Rope and that she returned home when the street lights came on – a few minutes before dark.  She also testified that these events occurred before petitioner and his family went to The Rope.  [id., 869-871]

She testified that the events she described occurred when petitioner and Justin were away from the house and "gone in the boat" and that A.B. was alone in the house and that this was sometime between 4:30 and 5:00 p.m. She then testified again that she went to A.B.'s house at "nightfall." [*id*. 872-873]

Then, before the jury, she testified, that she went to A.B.'s house in the afternoon around 2:30, 3:00 o'clock and stayed there until 4:30 or 5:00, when it was "starting to get dark." When she left A.B.'s house it was still light but when she arrived home the street lights were coming on. [id. 879] She testified that she left A.B. and Richard alone in the house and when she returned, Richard was gone and A.B. was sitting on the couch shaking. [id., 881]

**Sheree Thibodeaux** testified that she was with petitioner and A.B. and others at The Rope on July 11, 1999. She testified that A.B. was injured when the rope struck her in the eye. She also testified that the group left The Rope, went to Sonya's house and stayed at Sonya's house until it was almost dark before returning home. [id., pp. 920-921]

Finally, **Harry Anderson**, an investigator retained by petitioner took a pre-trial statement from Michelle Chapman. In a report he authored on behalf of petitioner's trial counsel, the investigator stated,

> During August 2001, I located Michelle Chapman at her house on Blum Blvd. She stated to me that she wanted to tell the truth about what happened but she was hesitant about coming forward because she didn't want to get anybody (Richard) in trouble. She stated that she was a visitor to the Robardi [sic] residence the evening of July 12, 1999 [sic], after the Robardi's had returned home from their outing. She states that Jason was apparently drunk and he had passed out in the bedroom. Amanda was there and Richard was there as was Justin. Richard eventually asked Michelle to go to the store to get some snaks [sic] and he gave her some money. She left and was gone for about 30 minutes. When she returned Richard was gone and [A.B.] was sitting on the couch apparently upset. She kept asking [A.B.] what was wrong and A.B. finally admitted to her that 'Richard made her do it with him and he

hurt her.' Michelle noticed a small amount of blood [on] A.B.'s clothing, got scared
and left and went home. [id., p. 1206]

The evidence in support of petitioner's claim of actual innocence is insufficient. Exhibit 1,

the affidavit of Michelle Chapman addresses mostly the issue of her aborted testimony at trial. With

regard to petitioner's claim of innocence, the affidavit provides only, "Richard [Barrack] was the

one that my friend A.B. told me she had sex with." [rec. doc. 7, Exhibit 1] Sonya Huffman, who is

not otherwise identified, claimed only that during the summer of 2004, A.B. ". . . told me that she

lied when she testified at trial. She told me that she had sex with Richard Barrack, but was afraid to

tell the truth at the time, as he had threatened her... [A.B.] admitted that she never had sex, nor was

she abused, at any time by her step-dad Jason. She admitted that Richard Barrack had sex with her

and that he had threatened her not to tell anyone about him." [rec. doc. 7, Exhibit 2] Justin Rebardi's

affidavit merely recants his trial testimony concerning what he witnessed on the evening in question.

It does not otherwise establish petitioner's innocence. [rec. doc. 7, Exhibit 3] Finally, the affidavit of

Gretta Rebardi, A.B.'s mother, provides only that she has "... serious reason to believe that my

daughter ... gave false information concerning the things that took place the night in question..."

[rec. doc. 7, Exhibit 4]

This evidence does not seriously call into question the overwhelming evidence of

petitioner's guilt which was adduced at trial. To the extent that petitioner relies upon the proffered

testimony of Michelle Chapman to establish his innocence, his reliance is clearly misplaced. As

shown above, Chapman's description of the chronology of events is confused at best and clearly at

odds with the testimony of all other witnesses. Further, the medical evidence established that the

victim was bleeding profusely after this incident, yet Chapman apparently noticed just small

amounts of blood. Further, Chapman indicated that upon her return from the store, A.B. was sitting

on the couch, sobbing. Yet, the investigators, who thoroughly searched the petitioner's home

discovered no blood or other biological evidence on the couch. While the DNA evidence strongly

suggested petitioner's guilt, there was absolutely NO evidence to establish that Richard Barrack, or

anyone else, had sex in the petitioner's home. Finally, petitioner himself, when questioned by the

police, advised that no one else had come to his home after he and A.B. and Justin returned from

The Rope.

In short, petitioner's claims were not properly exhausted and are now procedurally defaulted,

and dismissal on that basis is appropriate. Petitioner has established neither cause nor prejudice; nor

has he established actual innocence so as to justify a review of those claims on the merits.

### 3. The Merits

In the alternative, and to the extent that a review of the merits of petitioner's claims is in

order, each claim, as is shown below, is clearly without merit and subject to dismissal for that

reason.

To the extent that petitioner is entitled to a review of the merits of his claims, such review is

governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA") since this petition was filed  after the effective date of the AEDPA.  Since the State

courts adjudicated the merits of each of petitioner's claims (albeit only under the State law

principals argued by the petitioner and without the benefit of the evidence now proffered), federal

*habeas* review is governed by the provisions of the AEDPA, specifically 28 U.S.C. §§ 2254(d)(1)

and (2) which define the standard for review.  Under the AEDPA, *habeas* relief is not available to a

state prisoner on a claim which was adjudicated on the merits in State court proceedings unless the

adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

Questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), while pure questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir.2000), *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2001, 149 L.Ed.2d 1004 (2001).

The state court's decision is contrary to federal law within the meaning of § 2254(d)(1) if the state court applied a rule contradicting the governing law set forth in the Supreme Court's cases, or if the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's factual findings constitute "an unreasonable application of clearly established" Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The inquiry into the issue of "unreasonableness" is objective. *Id.* at 409-10. A state court's incorrect application of clearly established Supreme Court precedent is not enough to warrant federal *habeas* relief – the application must also be unreasonable. *Id.* at 410-12 (emphasis supplied).

The state court's factual findings are presumed to be correct. 28 U.S.C. § 2254(e)(1). In order to obtain *habeas* relief on the ground that the state court's decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court

proceeding," the petitioner must rebut by clear and convincing evidence the presumption that the

state court's factual findings are correct. See *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir.2000).

"[U]nder the deferential standard of AEDPA, [federal courts] review only the state court's

decision, not its reasoning or written opinion, to determine whether it is contrary to or a

misapplication of clearly established federal law." *Catalan v. Cockrell*, 315 F .3d 491, 493 (5th

Cir.2002), citing *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002)(*en banc*).

All of petitioner's federal claims were adjudicated on the merits by the First Circuit Court of

Appeals or the Sixteenth Judicial District Court on direct or collateral review. (Of course, as

previously noted, these adjudications were based solely on petitioner's state law arguments and were

not supported by the same evidence currently proffered.)  Therefore the deferential standards of

review outlined above must be utilized. Each of the claims has been examined in light of the

foregoing and as is shown hereinafter, each has been determined to be lacking in merit.

### a. Claim One – The trial court erred in failing to allow the defense to play a videotaped statement of one of the States' witnesses for the purpose of impeaching the witness's testimony. [rec. doc. 1, p. 12]

This issue was raised on direct appeal. The First Circuit adjudicated this claim on the merits

and denied relief citing four grounds for doing so:

(1)  "... we are not convinced that counsel adequately complied with the foundational
mandates of LSA-C.E. art. 613 as to most of the 'statements' cited to the court as
subject to impeachment with the videotape at issue..."

(2) "... there is no showing that the witness's trial response to the particular question
posed by defense counsel was inconsistent with the videotaped interview..."

(3) "... the details with which defense counsel hoped to impeach the child were
clearly subsumed in the child's broad and repeated statements to Chief Richard that
his father had **not** committed the rape in question and his frank admission at trial that
he had lied to Chief Richard because he was afraid to tell the truth. Viewing the
totality of the child's trial testimony, even if a proper foundation had been laid for

introduction of excerpts from the videotape in question, which it was not, the trial judge would not have abused his discretion by not admitting the videotape."

(4) "... even an erroneous evidentiary ruling will not warrant reversal of a conviction unless the alleged error, when compared to the totality of the record, had a substantial effect on the rights of the defendant ... That was not the case here. Even if the trial judge had allowed defendant to play those excerpts from the videotape that he believed would constitute impeachment evidence, we are fully satisfied that it would not have altered the outcome of the case. The child already impeached himself concerning his statement to Chief Richard."

[*State v. Rebardi*, rec. doc. 7, Exhibit B, at pp. 9-10; rec. doc. 17, SCR, pp. 1115-1119]

All of these findings of fact and conclusions of law are supported by the trial record. Petitioner's son, Justin Rebardi, was called to testify on behalf of the State;  he testified without equivocation that he witnessed the rape of his sister by his father, the petitioner. On cross-examination he was asked about his earlier conversations with Assistant Chief Richard in which he denied at least eight times that his father had done anything to his sister. Counsel asked, "And each one of those times you said he didn't, isn't that right?" To which the young witness responded, "Yes, sir." [rec. doc. 17, SCR, p. 815] Further, counsel was able to get Justin to admit that he denied any wrong doing on the part of his father in previous conversations with social workers. [id., p. 816] When counsel requested that the taped interview be played to the jury, the court denied the request since the witness admitted to making a prior statement inconsistent with the testimony at trial. [id., pp. 860-864]

Under Louisiana law, specifically La. C.E. art. 613, "... extrinsic evidence of ... prior inconsistent statements ... is admissible after the proponent has first fairly directed the witness' attention to the statement ... and the witness has been given the opportunity to admit the fact and has failed distinctly to do so."  As noted by the Louisiana courts, the witness did not deny making prior

inconsistent statements, therefore, the court was correct in denying petitioner's request to impeach the witness.

Finally, even assuming error on the part of the trial court, such error was harmless as pointed out by the Court of Appeals. This court may not grant *habeas corpus* relief for evidentiary errors committed by the trial court unless the trial court's errors amounted to a denial of fundamental fairness. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998). This was, in essence, the fourth finding of the First Circuit Court of Appeals which noted, " ... even an erroneous evidentiary ruling will not warrant reversal of a conviction unless the alleged error, when compared to the totality of the record, had a substantial effect on the rights of the defendant ... That was not the case here. Even if the trial judge had allowed defendant to play those excerpts from the videotape that he believed would constitute impeachment evidence, we are fully satisfied that it would not have altered the outcome of the case. The child already impeached himself concerning his statement to Chief Richard." [*State v. Rebardi*, rec. doc. 7, Exhibit B, at pp. 9-10; rec. doc. 17, SCR, pp. 1115-1119]

Petitioner has not shown that this finding and the court's ultimate conclusion were unreasonable and therefore Claim One is subject to dismissal on the merits.

**b. Claim Two – The trial court erred in denying the defense the right to present testimony about a statement made to a detective by a witness who allegedly asserted her Fifth Amendment privilege at trial, which denied the defendant the right to present a defense.**

The First Circuit rejected this claim, raised as Assignment of Error Number Two on direct appeal and observed,

> Before an out-of-court statement can be admitted pursuant to the residual rule allowing hearsay statements of an unavailable witness to be admitted under certain circumstances, a finding of trustworthiness is required. [citations omitted] In our view, the statement made by Michelle to defendant's investigator cannot be characterized as reliable or trustworthy. She apparently told the investigator that she visited the victim's home at night and that the victim and her cousin had sex while

the defendant was asleep in his room. This contradicts the testimony of the victim, the victim's half brother, and the facts as related by defendant himself to investigating officers. It is difficult to believe that an attack by a third party, sufficiently brutal to cause the injuries sustained by [the victim], would not have been heard by the victim's half brother and defendant. Defendant was sufficiently awake and lucid to drive home that evening at about 8:00 p.m. and to call his sister for help at about 9:00 p.m. At trial, Michelle testified under oath that she and her cousin visited [the victim's] home earlier in the day, before the family went to the Rope, when the defendant was not present. If a sexual encounter between [the victim] and Michelle's cousin did occur in the afternoon, as described by Michelle under oath, it is inconceivable that the afternoon encounter, before the family went to the Rope, was the same encounter that caused the severe injuries treated when the victim went to the hospital that night. Numerous witnesses who saw the victim at the Rope testified to her conduct there and did not observe any evidence of trauma. In sum, we do not believe that Michelle's statement to Anderson has sufficient indicia of reliability to render it admissible under LSA-C.E. art. 804(B)(6).... Thus the trial judge did not err in refusing to allow defense witness, Harry Anderson, to testify to Michelle Chapman's statements to him. [*State v. Rebardi*, at rec. doc. 7, Exhibit B, p. 14; rec. doc. 17, SCR, p. 1119-1125]

The hearsay statement that petitioner wanted to introduce at trial was the statement given by Michelle Chapman to defense investigator Harry Anderson. Anderson memorialized the conversation in a report that was ultimately proffered by the defense. According to that statement,

During August 2001, I located Michelle Chapman at her house on Blum Blvd. She stated to me that she wanted to tell the truth about what happened but she was hesitant about coming forward because she didn't want to get anybody (Richard) in trouble. She stated that she was a visitor to the Robardi [sic] residence the evening of July 12, 1999 [sic], after the Robardi's had returned home from their outing. She states that Jason was apparently drunk and he had passed out in the bedroom. Amanda was there and Richard was there as was Justin. Richard eventually asked Michelle to go to the store to get some snaks [sic] and he gave her some money. She left and was gone for about 30 minutes. When she returned Richard was gone and [A.B.] was sitting on the couch apparently upset. She kept asking [A.B.] what was wrong and A.B. finally admitted to her that 'Richard made her do it with him and he hurt her.' Michelle noticed a small amount of blood [on] A.B.'s clothing, got scared and left and went home. [rec. doc. 17, SCR, p. 1206]

This statement is not only at odds with the evidence adduced at trial, but also at odds with the testimony ultimately  provided by Michelle Chapman. In testimony that was ultimately stricken,

Michelle Chapman  testified as follows –  She saw and spoke with A.B. on July 11, 1999, but

before, not after, they returned from The Rope. [rec. doc. 17, SCR,  p. 866] She testified that she

and her cousin, Richard Barrack "...went and walked to [A.B.'s] house that day..." [id.]

At a hearing held outside the presence of the jury, she testified,

Okay, my cousin Richard, was at my house before that had happened and I asked him
if he would bring me, walk me down to [A.B's] house with him. Me and him went to
A.B.'s house and my Uncle Jason [petitioner] was in the boat with little Justin. They
went to the boat, they were in the boat.

And he had – Richard, we started sitting down, and talking, and we was getting
along; it was [A.B.'s]  second time meeting my cousin, Richard and she told me that
she like him. And I was like, okay.

And then he had stopped me and asked me if I would go to the store and go get them
a Coke. I said, yea, and I asked him for a dollar, to see if I can go get me a Coke, too;
and he gave me money for going to get a Coke.

So I went and walked to Myrtle's, and when I got back [A.B.] was sitting on the
couch and Richard was gone.

She was shaking, and I asked her what was wrong. She said, well, I did it. I said, you
did what? And she goes, well, me and Richard slept together. And I said, well what
happened?

And she was like – she said that – something like – she said that whenever they slept
together that he had stuck it in half-way, and she couldn't take it no more because it
was hurting her, and he just rammed it in real hard. ...

She had went to the bathroom after, and she showed me blood on toilet paper, and
that's all she had showed me.

When asked to state the time these events occurred, she stated, "I would say at least about

4:30, 5:00 o'clock..." She said she knew it was this time because she was supposed to be home

before 7:00 p.m. and it was still light outside. She then testified that she did not accompany the

family to The Rope and that she returned home when the street lights came on – a few minutes

before dark. She also testified that these events occurred before petitioner and his family went to The Rope. [id., 869-871]

She testified that the events she described occurred when petitioner and Justin were away from the house and "gone in the boat" and that A.B. was alone in the house and that this was sometime between 4:30 and 5:00 p.m. She then testified again that she went to A.B.'s house at "nightfall." [*id*. 872-873]

Then, before the jury, she testified, that she went to A.B.'s house in the afternoon around 2:30, 3:00 o'clock and stayed there until 4:30 or 5:00, when it was "starting to get dark." When she left A.B.'s house it was still light but when she arrived home the street lights were coming on. [id. 879] She testified that she left A.B. and Richard alone in the house and when she returned, Richard was gone and A.B. was sitting on the couch shaking. [*id*., 881]

In other words, the hearsay statement Chapman gave to Anderson was clearly at odds with her sworn testimony at trial and therefore the district court did not err in disallowing the statement. Additionally, under Louisiana law, the statement of the victim to Michelle was hearsay, and the statement of Michelle to Anderson was hearsay. Petitioner could offer no exception to the Louisiana hearsay rule which would have supported the statement's admissibility. Thus, again, since he fails to establish that the state court's findings and conclusions were unreasonable, his second claim for relief should also be denied on the merits.

### c. *Claim Three* – **The trial court erred in denying defendant's motion for mistrial.**

This claim was also raised as Assignment of Error Number Three on direct appeal. In disposing of this claim, the First Circuit concluded, "The determination as to whether or not a mistrial should be granted ... is within the sound discretion of the trial court, and a denial of a

motion for mistrial will not be disturbed on appeal absent an abuse of discretion [citations omitted].

After a thorough review of the record, we cannot say that the trial court erred in concluding that an

admonition to the jury was sufficient in this case. In our view, there has been no showing that the

momentary view of the witness crying was so prejudicial to warrant a mistrial." [rec. doc. 7, Exhibit

B, p. 16; rec. doc. 17, SCR, p. 1119-1125]

Petitioner has not shown how this conclusion was unreasonable.

*d. Claim Four* – **The prosecution improperly manipulated a witness to prevent her from testifying on petitioner's behalf in the violation of his Sixth Amendment right.**

As shown above, Michelle Chapman's sworn testimony in court was at odds with the

evidence adduced at trial and, more importantly was at odds with her prior out-of-court statement to

Mr. Anderson, petitioner's investigator.

This claim was raised as Claim One in petitioner's application for post-conviction relief. In

denying relief on this claim, the district court observed, "Pursuant to La. C.Cr.P. art. 930.2,

Petitioner has the burden of proving that the relief requested in his application for post-conviction

relief should be granted. Petitioner has not provided any evidence that Michelle Chapman was in

any way threatened by the prosecution during the court's recess. There are no supporting affidavits

from either Ms. Chapman or anyone who may have witnessed a confrontation in the lobby between

Ms. Chapman and prosecutors. Nor does petitioner state in his application that Ms. Chapman or

anyone else told him of such a confrontation. The Court notes that Petitioner's appeal to the First

Circuit included claims regarding the availability of Ms. Chapman's testimony. However, the above

claim, raised in this application for Post Conviction Relief, was omitted from Petitioner's appeal. In

addition, neither Petitioner nor his attorney at any time during the trial raised the issue that Ms.

Chapman may have been threatened by prosecutors." Citing La. C.Cr.P. art. 930.4(B) ("If the

application alleges a claim of which petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court may deny relief."), and noting that petitioner had knowledge of this claim at the time of trial and appeal, the court denied the claim noting, "Petitioner has failed to meet his burden of proof regarding this claim. In addition, he has not provided any reason why he failed to raise this claim during the trial or in his appeal to the First Circuit Court of Appeal, despite his prior knowledge that Ms. Chapman was allegedly threatened with a charge of perjury." [rec. doc. 7, Exhibit F]

Petitioner has provided the affidavit of Ms. Chapman who claims that she was intimidated by an unnamed prosecutor and by her court-appointed attorney, James Supple. With regard to this claim, petitioner did not present any evidence in support of the claim to the State courts. Consequently, the State courts did not reach the merits of the claim, other than to dismiss on the basis of petitioner's failure to carry the burden of proof.

Nevertheless, even if it is assumed that Ms. Chapman's allegations are true, petitioner's claim is subject to dismissal because petitioner cannot show how his cause was prejudiced. Put another way, petitioner has not shown that the error complained of "had a substantial and injurious effect" on the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). As shown above, Ms. Chapman's story contained numerous discrepancies concerning when the alleged sexual encounter occurred between A.B. and Chapman's cousin, Richard Barrack and whether or not petitioner and his son were present during the alleged encounter. Her testimony was clearly at odds with the physical evidence which established that the victim suffered massive trauma and bled profusely both at her home and at the hospital. In other words, even had Chapman gone forward with her testimony, her story could not have served to absolve the petitioner.

Again, petitioner has not carried the burden of persuasion with respect to this claim.

*e. Claim Five* **– The witness (Michelle Chapman) never stated that she was invoking her Fifth Amendment right not to testify.**

This claim was argued as Claim Two in petitioner's Application for Post-Conviction Relief. The trial court noted a procedural default and determined that dismissal pursuant to art. 930.4(B) was appropriate.

However, in the alternative, the court addressed the merits of the claim and noted, "Had Ms. Chapman wanted to testify, she could have responded with 'no' when asked by her attorney if she wished to invoke her Fifth Amendment rights. Furthermore, even though she became emotional, she could have returned to the courtroom to continue her testimony after calming down. She did neither. The Court did not merely assume, on its own, that Ms. Chapman wished to invoke her Fifth Amendment right not to testify. Her attorney, who had the authority to do so, invoke those rights on her behalf. In addition, the Court witnessed Ms. Chapman's responses when Mr. Supple questioned whether she wanted to testify or invoke the Fifth Amendment." [rec. doc. 7, Exhibit F]

Petitioner has not shown that the findings and conclusions of the State courts were unreasonable. In fact, a review of the trial transcript confirms the trial court's conclusions that Ms. Chapman was afforded the opportunity to reject the protections of the Fifth Amendment, but simply refused to do so.

In short, in addition to being subject to dismissal as technically exhausted but procedurally defaulted, all of the claims are also subject to being dismissed with prejudice on the merits.

*Conclusion and Recommendation*

Therefore, based on the foregoing,

**IT IS RECOMMENDED** that this petition for *habeas corpus* should be **DENIED AND DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See*, Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on April 6, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)